FREEMAN v. GRIEWE et al.†

(Court of Civil Appeals of Texas. El Paso. Jan. 25, 1912. Rehearing Denied Feb. 14, 1912.)

1. MASTER AND SERVANT (§ 286*)—INJURIES—JURY QUESTION—NEGLIGENCE.

Evidence, in an action for a switchman's death while coupling a car, held to make it a jury question whether the signal to move the train was negligently given by the other trainmen.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1010–1050; Dec. Dig. § 286.*]

2. MASTER AND SERVANT (§ 289*)—INJURIES—JURY QUESTION — CONTRIBUTORY NEGLIGENCE.

Evidence, in an action for a switchman's death while coupling a car, held to make it a jury question whether decedent was negligent.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1089–1132; Dec. Dig. § 289.*]

3. MASTER AND SERVANT (§ 288*)—INJURIES—JURY QUESTION—ASSUMED RISK.

Evidence, in an action for a switchman's death while coupling a car, held to make it a jury question whether decedent assumed the risk of riding on the brake beam, if he did so.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1068–1088; Dec. Dig. § 288.*]

4. APPEAL AND ERROR (§ 966*)—DISCRETION OF TRIAL COURT—REFUSING CONTINUANCE.

Defendant railroad company, in an action against it for the death of one of its switchmen, asked a continuance on the last day of the trial to procure the evidence of two physicians who had seen decedent at the hospital, and whose attendance at the hospital had in fact been procured by defendant's chief surgeon. The court had allowed all process to procure the witnesses which was asked, and the only affidavit as to what one of the witnesses would testify to was one by defendant's chief surgeon, to the effect that the witness told him that he had seen decedent in the hospital and that his mind was normal. Held, that the refusal to grant a continuance

to procure such witness was a matter within the trial court's discretion.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3837; Dec. Dig. § 966.*]

5. CONTINUANCE (§ 24*)—PROCURING ABSENT WITNESS—CUMULATIVE TESTIMONY.

Where, in an action for a switchman's death, the railroad company introduced certain physicians, who testified that decedent's mind was normal at the hospital, it was not error to refuse a continuance to procure other witnesses who would testify to the same effect; their testimony being cumulative.

[Ed. Note.—For other cases, see Continuance, Cent. Dig. § 72; Dec. Dig. § 24.*]

6. TRIAL (§ 124*)—IMPROPER ARGUMENT.

In an action for a switchman's death, plaintiff's counsel stated in argument that, after decedent was injured, defendant railroad company took him to the hospital and gave him morphine, which disordered his mind, causing delusions, and that it now seeks to bring these delusions into court to defeat his wife and child, and that, "if this can be done, then to hell with the courthouse." *Held*, that the quoted remarks were highly improper.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 302; Dec. Dig. § 124.*]

7. APPEAL AND ERROR (§ 1060*)—HARMLESS ERROR—IMPROPER ARGUMENT.

It cannot be said that the improper remark of plaintiff's counsel could have misled the jury so as to be reversible error.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 4135; Dec. Dig. § 1060.*]

8. DEATH (§ 99*) — EXCESSIVE DAMAGES — PERSONAL INJURIES.

The jury, in an action for a railroad switchman's death, awarded decedent's wife $10,000 and the child a like sum. Decedent had been earning various sums—$55 a month as a street car conductor; $65 a month as a clerk; $75 to $80 a month as a brakeman; and $85 to $90 a month as a switchman—and was about 27 years of age at the time of the accident; his wife being 22 years of age. *Held*, that the verdict in favor of the wife was not excessive, but the amount awarded to the child was excessive to the extent of $2,500.

[Ed. Note.—For other cases, see Death, Cent. Dig. §§ 125–130; Dec. Dig. § 99.*]

Appeal from District Court, Harris County; W. P. Hamblen, Judge.

Action by Della Griewe and another against T. J. Freeman, receiver of the International & Great Northern Railroad Company. From a judgment for plaintiffs, defendant appeals. Affirmed.

John M. King and Wilson, Dabney & Meachum, for appellant. John Lovejoy and J. W. Parker, for appellees.

PETICOLAS, C. J. This is a personal injury suit resulting from the death on February 13, 1909, of Joseph L. Griewe in the appellant's yards at Houston, Tex.

[1, 2] In this case a switching crew were handling cars in the yards at Houston, Tex., on tracks which may be here described as running north and south. A cut of these cars had been taken northerly on one of the tracks for distribution on other tracks, and in so doing car 16044 had been separated from certain cars that remained souther-

ly on said track, had been carried about 25 car lengths northerly, and had been left at that point while the engine distributed the other cars. On return of the engine with one car attached, it was intended to couple onto car 16044, push it southerly, and couple it onto the cars remaining at that point. The testimony tends to show, although it does not establish it absolutely, that the proceedings stated would leave car 16044 with the knuckle of the southerly coupler closed, and establishes that this was a Janney coupler.

The engine backed southerly towards car 16044. At that time, and just preceding the impact with the northerly end of car 16044 one Morris, a switchman, was riding on the rear end of the tender on the footboard. Griewe and a switchman named Raines were sitting on the eastern side of car 16044 on the truss rods. As the engine approached, Morris called to them, and they rose and turned towards the southerly end of car 16044. Raines stopped before he reached the end of that car, and Griewe went out of sight behind the end of the car, presumably for the purpose of opening the knuckle on the coupler so that it would not be necessary to stop again before reaching the other cars in order to open this knuckle.

The testimony shows that, as indicated, it was necessary to open this knuckle; that it was Griewe's duty to open it; and that in going behind the end of the car for that purpose he did what was usual and customary, was in the line of his employment, and called for by his duties. It also shows that to open this knuckle it was necessary to use both hands, one hand to lift the pin and one hand to open the knuckle; the lift lever being on the western side of the car at its southerly end.

It seems to be uncontroverted that, when the coupling was made to the northerly end of 16044, it was made gently, with no sudden jar. The engineer testified that he received a signal to go on, or back up; that the car moved southerly a distance varying from a half to a car length, when he received a sudden stop signal, and Griewe was found lying at the southerly end of the car, immediately adjacent to and outside of the eastern rail. Apparently the car wheel on that corner had, as one witness described it, "run up his leg." His shoe was cut and his leg was mashed from the foot upward. The accident happened at night, and from the injuries he received he afterwards died.

The negligence alleged was that Morris and Raines signaled the engineer in charge of the engine to set the cars in motion without a signal from Griewe to do so, or notice to Griewe of their intention to do so, and that the said switchmen in so signaling were guilty of negligence.

Raines did not testify in the case. The

injury happened on February 13th, and on that date Switchman Morris, on a regular blank provided for the purpose, made a statement to the railroad company in which he said that he (Morris) gave the signal. On February 17th Morris made a statement, written by one Watts, claim agent of defendant, in which he said Griewe gave the signal. On June 18th he made another statement for the claim agent, written by him, in which he said he *presumed* the signal was given by Griewe. On the trial Morris testified by deposition: That, while the engine was going down to couple onto 16044, he was riding on the footboard. That Griewe and Raines were sitting on the truss rods on 16044. That he called to them. They got up and started to the south end of the car. Raines stopped short before he got to the end of the car, and Griewe passed around the end of the car out of view. "After the cars were coupled, I received a signal, to be communicated to the engineer, to set the cars in motion. The man who gave the signal was standing at the east side of car 16044 and down towards the south end of the car. It must have been Raines who gave the signal, because I saw Griewe pass around the end of the car. From the time I saw Griewe go around the end of the car until the signal was given about a minute elapsed. There were no persons other than Raines and Griewe around 16044 just before the time of the accident. Under the conditions here present, Griewe should have given the signal for the movement of the cars. They should not have been set in motion without a signal from Griewe, unless the party who gave the signal first knew where Griewe was and that he was in a safe place." He stated on cross-examination that, at the time he made the first statement to Watts, he thought that Griewe gave the signal; but owing to the fact that Griewe was run over, and Raines was standing at the side of the car, he had concluded that Raines was the man that gave the signal; that Watts had miswritten his statement in putting it positively that Griewe gave the signal, instead of stating that he thought that Griewe gave the signal. As to the second statement to Watts, his explanation was: "I did not state in the various statements that have been given before this time all the things that I stated in this deposition because they were never brought to my attention." He said in reference to his statement that he gave the signal that all he meant in reference to that was that he repeated the signal which he got. It was also in evidence that after the accident Morris had been discharged by the defendant company owing to the fact that he had caused an accident in the yards and made a false statement about it.

Griewe himself on the night of the accident made no statement about the injury, saying that he was too sick to talk. Morris called on him at the hospital the day after the accident, and testifies that Griewe told him that he was standing on the brake beam of 16044, that the cars had come together hard and jarred him off, and stated that Griewe seemed then to be in a delirious condition; that he would say a few words and then stop. Morris further testified that Griewe's idea that he was jarred off must be a mistake, because he had made the coupling gently. Wells, the other switchman, testified that he was at the northerly end of affairs, that the engine passed the witness just before the accident, and Morris was on the footboard; Raines standing about 30 feet from where Griewe was injured just before Griewe was injured. He was to the north of the car and a few feet to the east of it, and the only switchman present that was near Griewe. "I saw Raines, the foreman, about 30 feet from where Griewe was found injured, just before Griewe was injured. Morris was on the hind end of the engine. If Griewe put his feet on the brake beam and caught hold of the handhold, he would have had to ride in a somewhat cramped position. He would have had the whole car between him and the engineer if he rode in that position and would have been unable to signal the engineer, although he could have reached out with one hand and done so, but it would not have been a good signal."

Without attempting to state the testimony in its minutiæ, it may be further stated that certain doctors and an orderly at the hospital and a patient at the hospital testified to statements which Griewe made within the first few days after the accident, which may be summarized as follows: To one he said that he was riding on the brake beam, and the jar of the coupling knocked him off. To another he stated that he had his feet on the brake beam and was holding to a handhold, and the handhold pulled out. To a third he stated that he had one foot on the brake beam and one foot on the journal box and the handhold pulled out. It was conclusively shown that, as a matter of fact, the handhold did not pull out. It was also shown that, while it was possible to ride with one foot on the brake beam and one on the journal box, no one practically ever rode that way; that it would be such an awkward and cramped position that no one would attempt it. And we understand that appellants do not contend that Griewe was riding in that position and do not contend that the handhold pulled out. Their contention seems to be that Griewe was riding with his feet on the brake beam and that he fell from that position. It was contended by the appellees that the statements made by Griewe at the hospital were shown by the indisputable facts to have been untrue, and that the statements were hallucinations caused by shock and drugs. Dr. Davidson testified, among other things, that frequent-

ly, for a man injured as Griewe was, they administered morphine; that morphine has more effect on some people than it does on others in the way of creating illusions; that Griewe had the appearance of being abnormally shocked, "and such a shock as I suppose he received would affect the minds of some people; that if as a matter of fact the handhold on the car which ran over Griewe never did give way, and yet he said it gave way, I account for that fact in no other way except on the theory that his mind was not acting right." Hill, a patient in the hospital, stated, among other things, that Griewe was put under the influence of morphine and never was out from under the influence of it. The testimony established that Griewe was very sick from the time he was first brought into the hospital; that he kept on growing weaker all the time until he died. Hill testified further that during all the time he was in the hospital the nurses first, and then the doctors, injected morphine into him, and the nurses kept on giving it to him until he died. The father and mother of Griewe came to see him at the hospital at different times, and testified that he made no statement to them.

It is very strenuously contended by the appellant that this court should reverse the judgment of the trial court on the facts. Their contention is that the indicia of the falsity of Morris' statements are so strong as to necessitate a finding that the evidence is insufficient to support the verdict. This position is not without its strength, but after consideration we reach the conclusion that the position should not be sustained. It is true that Morris made different statements, and that he had a sufficient motive for testifying falsely. It is true, also, that Griewe made statements entirely contradictory of appellee's theory of the case; but we are of the opinion that when it is borne in mind that the other witnesses put Griewe behind the end of the car, out of sight, and leave Raines the only man in sight, such facts tend to prove that Raines, in fact, gave the signal; that when the unattacked witnesses put Morris on the footboard of the engine, it tends to prove that the signal the engineer got was from the man in sight—Raines, or from Morris, repeating from Raines. The engineer testified that a signal was given to set the cars in motion. "Morris was on my side of the engine, about 8 or 10 feet from me, towards the end of the tank, on the ground. There was no obstruction between me and the rear of the cars. I did not see Griewe at any time after we made the coupling. I would have seen him if he had been on my side of the car. If Griewe had given Morris the signal for the cars to be set in motion, he would have had to be on the same side of the car with Morris. If Griewe had been on the same side with Morris, he would have been in my view if I had looked in his direction. I did not see

Griewe give Morris any signal to set the cars in motion."

It will be remembered that Morris repeated, according to his statement, a signal from some one else. If this signal came from Griewe, it would tend to show, of course, nonliability on the part of appellants. If it came from Raines, it would tend to show liability on the part of appellants.

To our minds the case is one in which Griewe in the performance of his duty went behind the end of the cars, the cars were moved, and Griewe was injured. The testimony is sufficient to raise an issue of fact that the signal to move was negligently given. It seems to us that this made for the plaintiff a prima facie case. The statements made by Griewe himself are material as tending to show contributory negligence on his part; but we are unable to conceive that these statements, made at the time and under the conditions they were made, are sufficient to show contributory negligence as a matter of law, and thus require a reversal on that proposition; and we are also of the opinion that, made at the time and place they were made, they are insufficient to require us on the facts to reverse the case upon the proposition that the testimony establishes that there was no negligence on the part of appellants. If the statements made by Griewe had been borne out by the facts, they might have been very potent to establish lack of negligence on the part of appellant; but when the other facts show that no one of the statements made by him is true, when it is shown that he made three different statements no one of which is established by the other facts in the case, when it appears that the man was suffering from horrible shock and continuously under the influence of morphine, daily growing weaker and more disinclined to think or talk of the accident which had occurred, we can but believe that the evidence as a whole was sufficient to be submitted to the jury for them to determine what was the real truth of the matter. It is concededly correct in some cases for an appellate court to control the verdict of the jury on the facts; but this case, in our opinion, is not one of them.

It should also be borne in mind that, taking the unattacked testimony of the engineer, somebody gave him a signal. In his statements made at the hospital Griewe at no time stated that he gave the signal. The signal was the negligent cause of the injury. The only testimony tending to show that Griewe gave this signal is contained in one of Morris' statements, not the first one, and which he afterwards denied. This is the only testimony, to our minds, in the case which, if conceded to be true, would require us to reverse the case, and we are unable to see how this court would be justified in taking one of three statements made by Morris, and, saying that that was the true statement, reverse the case on the facts because

the jury evidently believed the other statements. To state this position clearly is, to our minds, to refute it—is to evidence the fact that the case was essentially one for a jury's determination.

Appellant contends that, if it be conceded that Raines gave the signal, nevertheless the mode of Griewe's death rests only in conjecture, and cites a great many cases, none of which, we think, are applicable to the case at bar. When it appeared from the testimony that Griewe went behind the end of the car for the purpose of performing a duty called for by his employment, and when it is shown sufficiently to raise an issue of fact that the cars were moved in his direction negligently and without warning to him or opportunity to escape from them, we think the plaintiff made a prima facie case. There is direct evidence tending to prove all of these matters sufficiently, in our judgment, to raise issues of fact upon them. We have, then, proof that Griewe was discharging the duties of his employment, that although out of sight he was behind the end of the car to the knowledge of the rest of the switch crew, and while there, without warning and with no notice to him, the cars were backed down upon him and he was killed. We do not believe that the plaintiff had to prove more than this to make a prima facie case. Whether Griewe was adjusting the knuckle, was riding on the brake beam, was walking down the track, or what he was doing, seems to us a matter for the defendant to show, if the same tended to show a defense to this case.

[3] It will also be noted that, even if we conceded that Griewe's statement that he was riding upon the brake beam was true, it would still remain an issue to be submitted to the jury whether or not riding upon such brake beam was contributory negligence, and whether he assumed the risk in so doing. Paragraphs 6 and 7 of the court's charge were as follows:

"(6) On the other hand, if you do not believe, from a preponderance of the evidence, the fact or any of the facts to exist, submitted to you in the preceding paragraph of this charge, as necessary for you to find before you can return a verdict for plaintiffs; or if you do not believe the said Griewe undertook to open the knuckle in the coupler in the south end of said car 16044 preparatory to coupling the said car to a car on lead track No. 1, and was injured in the performance of such service, or do not believe it was proper for him to open the knuckle at said time or place or in the manner done, or do not believe that the cars were set in motion by the engineer, and plaintiff injured, upon a signal given by E. Raines, the foreman, so to do; or if you believe the said Griewe gave the back-up signal which caused the cars to be set in motion; or if you believe he was on the brake beam of the car and fell therefrom, or undertook to get on the brake beam and missed his footing or fell therefrom, or was caused to fall and be injured by a handhold in the end of the car pulling out—you will in either such case likewise return a verdict for defendant.

"(7) Or if you believe the said Griewe undertook to open the said knuckle on car No. 16044, at the place where the car attached to the switch engine was coupled onto the same, but yet believe that in attempting to perform or in performing the service at the time or place or in the manner done he was guilty of contributory negligence; or if you believe that Griewe knew, or in the exercise of ordinary care in the discharge of his duties would have known, that the cars might be moved without any signal from him so to do or without knowing he was in a place of safety, and notwithstanding you believe he undertook to open the said knuckle—then in such case he assumed the risk or injury from the movement of said cars, and, so finding in either case, you will likewise return a verdict for defendant, and this, too notwithstanding you may believe the said Raines gave the back-up signal and in so doing was guilty of negligence which was the proximate cause of the injury and death of said Griewe."

And at the request of defendant the court gave the following special charges:

"The court is requested to charge the jury as follows, in the event that he fails to give some special peremptory charge requested, insistence upon which is not waived, in the event he submits this case to the jury without a peremptory charge for the defendant: The plaintiffs claim that Mr. Griewe was hurt by the cars being backed down upon him by the action of Raines in signaling to the engineer to back the cars while Mr. Griewe was behind the car for the purpose of adjusting the knuckle and coupling apparatus. The defendants claim that Mr. Griewe was riding on the car, and that he himself had given or participated in giving the back-up signal. You are instructed that the plaintiffs must recover upon proof by a preponderance of the evidence of the case claimed by them, and that if Mr. Griewe was not injured while behind the car for the purpose of making the coupling in your belief, or was riding the brake beam or doing something else, but in some other way, no matter how, then it is unnecessary for you to consider the questions of whether or not he was in line of his duty, whether or not he was working in an unnecessarily dangerous way, or whether he was chargeable with contributory negligence or had assumed the risk, and, if you so believe, your verdict will be for the defendant.

"Subject to the refusal of the court to give some one of the peremptory charges requested, which are insisted upon, and not yielding his contention that plaintiffs have no right of recovery in this case, the court is requested to charge the jury as follows: You are charged that the defendant, as receiver, oper-

ating the International & Great Northern Railroad Company, was not an insurer of the safety of its employés, but is and was only bound to use ordinary care to protect them from injuries; and you are further instructed that it was the duty of Mr. Griewe while working in the yard of the International & Great Northern Railroad Company as a switchman, which company was in the hands of the defendant as receiver, to use ordinary care to avoid injury to himself while the cars of defendant were being operated upon the tracks in said yards; and, if you find from the testimony that Mr. Griewe failed to use such care, then this was negligence, and if such negligence, if any, was a proximate cause of Mr. Griewe's injury, contributing thereto, then plaintiffs cannot recover, although you may believe that defendant's agents and employés or some one of them in operating the cars at the time of the injury were also guilty of negligence—that is, lacking in ordinary care, in causing Mr. Griewe's injury.

"The court is requested to charge the jury as follows, in the event that he fails to give some special peremptory charge requested, insistence upon which is not waived, in the event he submits this case to the jury without a peremptory charge for the defendant: If an employé in the discharge of his work—that is, work in the line for which he is employed—unnecessarily takes a position which he is not required to take under the circumstances, or attempts to perform his work in an unnecessarily dangerous manner, then you are instructed that he assumes the risk attaching to such position or unnecessarily dangerous way of performing his work, and that no recovery can be had under such circumstances. Therefore, even though you believe from the preponderance of the evidence that Mr. Griewe went behind the car for the purpose of adjusting the knuckle with a view of making a coupling further down the track, and although you may believe that Raines, his coemployé, while he was in this position, negligently signaled the engineer to back the car, whereby he was injured, and if you furthermore believe from the .evidence that there was a duty for him to adjust the knuckle with a view of making the coupling, all of which is denied by the defendant, yet, if you believe from the evidence that this was an unnecessarily dangerous way for Mr. Griewe to perform his duties, to which a greater risk attached than may have been necessary, and that his duties could have been performed in a different way, you will find for the defendant."

[4, 5] By bill of exceptions No. 35 it is shown that on the last day of the trial it was for the first time developed in this case that Drs. Kyle and Eckhardt had seen Griewe while he was in the hospital; but that Dr. Kyle was out of town, and Dr. Eckhardt was in town and had promised in the forenoon to attend to testify; that the arrangements for Eckhardt's attendance had been made about the adjournment of the court at the dinner hour; that a subpœna was issued for him and placed in the hands of a deputy sheriff, together with $1 witness fee; that later in the afternoon it developed that Dr. Eckhardt had refused to attend under the subpœna, and appellee moved the court to give them time to procure the attendance of Dr. Eckhardt, which the court refused to do. The court qualifies the bill by stating that the reason was that Dr. Howard, defendant's chief surgeon, had procured the attendance of Drs. Kyle and Eckhardt on Griewe, and there was no excuse for the appellant's not knowing that fact and having them in attendance without delaying the court. No statement was made as to what Dr. Eckhardt's testimony would be; that the court did prolong the trial for the parties at all times and allowed all process that was demanded, and after witnesses did not appear the court did not allow further time. The refusal to hold the case open to get the said witness Eckhardt is assigned as error. It will be noted that the bill of exceptions does not show what the testimony of Eckhardt would have been. Upon motion for new trial, however, affidavits were presented of Dr. Kyle, in which Dr. Kyle stated that he had seen Griewe a number of times at the hospital and found his mental condition clear at each visit; that his mind did not seem to be abnormal and under the influence of drugs; that he could make plain statements. No affidavit was produced showing what Eckhardt would have testified to, except one made by Dr. Howard in which he swore that he saw Dr. Eckhardt on the day that he (Howard) testified, that Eckhardt told him that he had seen Griewe in the hospital and his mind, in his opinion (Eckhardt's opinion), was in a normal condition.

We do not think the assignment is well taken, for two reasons: First, because the matter was one properly within the discretion of the trial court; second, it sufficiently appears that the testimony sought was merely cumulative. The appellants introduced physicians who testified that Griewe's mind was normal at the hospital.

[6] Another contention made by appellant and assigned as error is to language used by Mr. Parker, counsel for appellee, in argument. The exact language used was this: "After Mr. Griewe was injured, the railroad took him to the hospital and gave him morphine, which disordered his mind so that he had delusions, and now seek to bring these delusions into court and use them to defeat his wife and child. If this can be done, then to hell with the courthouse." No exception was taken to the language at the time; but appellants contend that it was both profane and violent, and that the jury was manifestly prejudiced thereby. The bill of exceptions shows that defendant's counsel in their addresses to the jury criticised

plaintiff's counsel for using the language and claimed that the same was highly improper. We are of the opinion that none of the language infringes upon the latitude allowed to counsel in discussing the facts as they appear in this case, except the statement, "If this can be done, then to hell with the courthouse." It is apparent that this language was highly improper, uncalled for by the facts, and certainly should not have been indulged in.

[7] But the question specifically presented to this court is: Should we reverse the case because of the use of this language? The reason of the rule for reversing cases for improper remarks of counsel is that thereby the jury may have been misled, their passions and sympathies aroused so that they are caused to render an untrue verdict. In nearly all the cases in which reversals have been had for such language, the remarks complained of have extended over some considerable portion of the argument, and it seems to us that, if we believed that the isolated improper remark here quoted influenced the jury, we should reverse the case; but, if we do not believe that it did have any appreciable influence upon their verdict, we should not reverse the case. As we believe this to be the true test, and as we do not believe that this remark, though highly improper and uncalled for, had any appreciable effect on the result of the case, the assignment is overruled.

[8] The only other assignment is that the verdict of the jury is excessive. The jury awarded the sum of $9,999 to Mrs. Griewe, and to her child a like sum, or practically $20,000 together, $10,000 for each of them. Mr. Griewe had been earning various sums: As street car conductor $55 a month; clerk, $65 a month; brakeman, $75 to $80 per month; switchman, $85 to $90 per month. He was about 27 years old at the time of the accident, and was employed as a switchman.

His wife was 22 years old. We are of opinion that the verdict in favor of the wife is not excessive, but are of the opinion that the verdict in favor of the child is excessive to the extent of $2,500. The income from the sum of money awarded, if invested at 6 per cent., would amount to practically $600 a year. Under the testimony, the maximum that Griewe was making was $1,080 a year. It will be seen that there was thus awarded to the child a sum which would produce an income considerably more than half the entire earnings of the father if he could be assumed to work all the time. We are able to see that this might be a proper thing to do in some cases, but we do not find any special circumstances in this case which call for so high an award.

It is true that it does not always follow that, because an appellate court is of the opinion that a verdict is higher than it would have awarded, it should therefore require a remittitur; but it can also readily be seen that if, believing this verdict in favor of the child too high, we do not require a remittitur, then the case becomes a precedent in the next instance of a high verdict, and, if in that case likewise no remittitur is required because the verdict is not grossly excessive, it, in turn, becomes a precedent, and so on; each successive case setting a higher figure at which like verdicts will be sustained. We therefore conceive it our duty to require a remittitur from the child of $2,500.

Having found no other error in the case below, if within 10 days from this date a remittitur of $2,500 shall be filed on behalf of the child, the case will be affirmed; otherwise, it will be reversed and remanded. The costs of the trial court will be taxed against the appellant, and the costs of the appeal will be taxed against the appellees.

Affirmed.